**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 25-CR-39-002 (AHA)** |
| **JAMES GASKINS,** | |
| **Defendant.** | |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this Memorandum in Aid of Sentencing. The defendant, James Gaskins, is before this Court after pleading guilty to one count of Unlawful Possession of a Firearm and Ammunition, in violation of 18 U.S.C. § 922(g)(1). For the reasons that follow, the United States respectfully requests that the Court sentence the defendant to a term of 70 months' imprisonment. Because the defendant has pleaded guilty in D.C. Superior Court in connection with a felony committed after the defendant entered a plea in the instant matter, it is the government's position that the defendant has forfeited his three points for acceptance of responsibility.  This sentence is at the midpoint of the guidelines range, if the Court agrees with the government's Estimated Offense Level calculation and its position regarding the impact of the Defendant's subsequent felony offense.  If the Court agrees with the defense's anticipated Estimated Offense Level calculation, the government is asking that the Court sentence the defendant to a term of 57 months' imprisonment.[1] In either case, the government is asking for three years of supervised release.

---

[1] This assumes that the Court agrees with government about the inapplicability of U.S.S.G. § 3E1.1.

1

I.      **FACTUAL BACKGROUND**

The factual proffer to which the defendant agreed as part of his September 12, 2025, guilty plea establishes the following uncontested facts:

On Friday, October 4, 2024, officers with the Metropolitan Police Department ("MPD") stopped James Gaskins behind 2853 28th Street SE.

While Officers were pursuing him, Mr. Gaskins threw a firearm towards the roof of 2857 28th Street SE. The firearm was later recovered and determined to be a Glock 17 9mm semi-automatic handgun bearing serial #YSW969 loaded with 1 round in the chamber and an additional 16 rounds in a 17-round capacity magazine.

Officers searched a Honda Odyssey that matched keys found on Mr. Gaskins' codefendant and found a satchel with Mr. Gaskins's identification inside. In the satchel with Mr. Gaskins's identification, officers found a plastic bag containing 11 green "zips" with a powder-like substance, and a separate rock-like substance broken up into a plastic bag. The substances later tested positive for cocaine base.

Prior to October 4, 2024, Mr. Gaskins had been convicted of a crime punishable by imprisonment for a term exceeding one year and had knowledge of that fact. Specifically, on March 19, 2023, Mr. Gaskins was convicted in D.C. Superior Court docket 2018 CF2 13757 to Unlawful Possession of a Firearm, which is a crime punishable of imprisonment for a term exceeding one year.

There are no firearm and ammunition manufacturers inside of the District of Columbia and therefore the firearm and ammunition traveled in interstate commerce.

In addition to the agreed upon facts as set forth in the Statement of Offense, the Statement of Facts filed with the Complaint in this case described forensic testing. (ECF No. 1). On October

5, 2024, a D.C. Superior Court search warrant was authorized to seize DNA samples from Gaskins for comparison to swabs from the firearm Gaskins was believed to have thrown onto the roof. Swabs from the firearm and the known buccal swab for Gaskins were sent to the FBI Laboratory for testing. On January 17, 2025, the results of the DNA were obtained. The FBI laboratory noted the following:

> *Male and female DNA was obtained from item 2 [swab of firearm]. Item 2 was interpreted as originating from four individuals. The DNA results from item 2 are 570 sextillion times more likely if GASKINS and three unknown, unrelated people are contributors than if four unknown, unrelated people are contributors. [...]*
> *[...]*
> *Male and female DNA was obtained from item 3 [swab of magazine]. Item 3 was interpreted as originating from four individuals. The DNA results from item 3 are 170,000 times more likely if GASKINS and three unknown, unrelated people are contributors than if four unknown, unrelated people are contributors.*

On January 15, 2026, after the defendant entered a guilty plea for the instant case, the defendant was arrested for alleged firearm and drug possession and charged in D.C. Superior Court matter 2026 CF2 000876.  On March 27, 2026, the defendant entered a guilty plea to Possession with Intent to Distribute More than Half a Pound of Marijuana in violation of 48 D.C. Code § 904.01(a)(1).  The defendant is currently pending sentencing in that matter.

II.    **PROCEDURAL HISTORY**

On January 23, 2025, a magistrate judge signed a criminal complaint, charging the defendant with Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year, in violation of 18 U.S.C. § 922(g)(1). (ECF No. 1).  On February 4, 2025, a federal grand jury returned a two-count indictment, charging Mr. Gaskins' codefendant with the same charge in Count One and Mr.

Gaskins, with the same charge in Count Two. (ECF No. 12). On September 12, 2025, the defendant pled guilty pursuant to a negotiated agreement. (ECF No. 65). Under the agreement, the defendant pled guilty to Count Two of the Indictment in exchange for the government agreeing to cap its sentencing recommendation at the midpoint of the Guidelines range, as ultimately determined by the court. (ECF No. 65 at 5). The parties also agreed to litigate the applicability of the enhancement for Reckless Endangerment During Flight. (*Id*. at 2-3).

## III.    LEGAL STANDARD

Although the Sentencing Guidelines are advisory, under *United States v. Booker*, a sentencing court "must consult those Guidelines and take them into account when sentencing." 543 U.S. 220, 264 (2005); *United States v. Brown*, 892 F.3d 385, 399 (D.C. Cir. 2018). The Supreme Court has noted that while the Guidelines provide "the starting point and the initial benchmark" for sentencing, the district court should consider all the § 3553(a) factors. *Gall v. United States*, 552 U.S. 38, 49–50 (2007). The Guidelines' recommended sentencing range will ordinarily "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Kimbrough v. United States*, 552 U.S. 85, 108–09 (2007). The listed factors in 18 U.S.C. § 3553(a) include the following:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed –
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

4

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for –
    (A) the applicable category of offense committed by
the applicable category of defendant as set forth in
the guidelines –
        (i) issued by the Sentencing Commission ...;
and
        (ii) that, . . . are in effect on the date
the defendant is sentenced; ...

(5) any pertinent policy statement –
    (A) issued by the Sentencing Commission ... and
    (B) that, . . . is in effect on the date the defendant is
sentenced.

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

## IV.    <u>UNITED STATES' ANALYSIS OF THE SENTENCING GUIDELINES</u>

### A.  The Defendant's Total Offense Level is 22

The defendant's total offense level is 22 under the calculations listed below:

*Count One: 18 U.S.C. § 922(g)(1)*

| U.S.S.G § 2K2.1(a)(4)(B) | Base Offense Level | 20 |
| U.S.S.G § 3C1.2 | Reckless Endangerment | +2 |
| | **Offense Level** | **22** |

The base offense level for Count One is 20 under U.S.S.G. §2K2.1(a)(4)(B) because, as discussed below, the offense involved a semi-automatic firearm described in 26 U.S.C. 5845(a) and he had been convicted of a prohibited offense at the time he committed the instant crime. A two-point enhancement pursuant to U.S.S.G § 3C1.2 is applicable here because the defendant threw a firearm while running from law enforcement. At the time that the defendant was encountered by law enforcement, he was in a residential area and ended up fleeing in an alley

between two residential buildings.  The government anticipates that the defendant will argue that U.S.S.G § 3C1.2 does not apply.  However, because the residential nature of the area where the defendant fled would have been readily apparent to the defendant, the government contends that his discarding of a loaded firearm was very dangerous and certainly recklessly put others in danger.

The government acknowledges that a four-level enhancement, pursuant to U.S.S.G. § 2K2.1(7)(B), does not apply in this case.

Though the plea agreement entered into in September 2025 anticipated a three points deduction for  acceptance of responsibility under U.S.S.G. §3E1.1(b), the defendant's subsequent conviction for a felony offense while he was pending sentencing in this matter implicates page 3 of the plea agreement, which allows the government to seek denial of the deduction where a defendant "engaged in addition criminal conduct after signing [the] Agreement."  (ECF 65 at 3). The Commentary to 3E1.1 makes clear that a "defendant who enters a guilty plea is not entitled to an adjustment under this section as a matter of right." § 3E1.1, comment. (n.3).  It further specifies that a relevant consideration for the applicability of the section is "voluntary termination or withdrawal from criminal conduct or associations[.]"  *Id*. at comment. (n.1.B).  This court has acknowledged that where a defendant engages in criminal conduct after entering a guilty plea, even where the plea agreement "contemplated that [the defendant] would receive the full three-point adjustment for acceptance of responsibility[,]" subsequent efforts to distribute drugs negated acceptance of responsibility.  *United States v. Shah*, 263 F. Supp. 2d 10, 37 (D.D.C. 2003), *aff'd and remanded*, 453 F.3d 520 (D.C. Cir. 2006).  The court held that because of the subsequent criminal conduct, the defendant "did not accept responsibility within the meaning of § 3E1.1." *Id*.; *see United States v. Ceccarani*, 98 F.3d 126, 129 (3d Cir. 1996) (affirming "the notion that the defendant's post-offense conduct can shed significant light on the genuineness of a defendant's

claimed remorse.").  Because the defendant, committed another felony offense just a few months after he entered his guilty plea in this case, he has not accepted responsibility within the meaning of the guidelines and is not entitled to a reduction in points.

**B.  The Defendant's Criminal History Category is IV, and His Guidelines Range Is  63-78 Months' Imprisonment**

The government concurs with Probation's assessment of the defendant's criminal history, as set forth in the PSR. U.S.S.G. § 4A1.1 governs the calculation of a defendant's criminal history for Guidelines' purposes. Section 4A1.1 assigns "points" for each of defendant's prior sentences of imprisonment; the number of criminal history "points" assigned to each sentence depends on the severity of the sentence and when it was imposed. U.S.S.G. §§ 4A1.1(a)-(d). As reflected in the PSR, the defendant's total criminal history score is nine, establishing a criminal history category of IV. *See* PSR at 18, ¶42.

With a criminal history category of IV and a total offense level of 22, the defendant's guidelines range is 63 to 78 months' imprisonment. As previously acknowledged, the government will cap its allocution at the midpoint of the Guidelines range.

**V.    THE GOVERNMENT'S SENTENCING RECOMMENDATION**

The crime at issue here merits 70 months of incarceration. In this case, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the desire to avoid unwanted sentence disparities, § 3553(a)(6).

**A.  Nature and Circumstances of the Offense**

This offense was serious, dangerous, and entirely avoidable. The defendant knowingly possessed a loaded semi-automatic firearm, with a round chambered and an extended-capacity

magazine, in a residential neighborhood of the District of Columbia. That conduct alone possessed a substantial risk to the public. *See, e.g.*, *United States v. Gassaway*, No. 21-CR-550 (RCL), 2021 WL 4206616, at *3 (D.D.C. Sept. 16, 2021) (collecting cases in this district holding that unlawful firearm possession is dangerous to the public); *United States v. Howard*, No. 20-MJ-181 (BAH), 2020 WL 5642288, at *2–3 (D.D.C. Sept. 21, 2020) (making same observation); *United States v. Cole*, 459 F. Supp. 3d 116, 120 (D.D.C. 2020) (noting that a loaded firearm "has the great potential to escalate into violence").

But the danger did not stop there. When confronted by law enforcement, the defendant fled and discarded the loaded firearm while running through an alley between residential buildings. Tossing a loaded firearm in a populated area is not a passive act— it is precisely the type of conduct that creates an unjustifiable risk of catastrophic harm. The firearm could have discharged upon impact, been recovered by a bystander, or been accessed by a child. The defendant's conduct therefore escalated an already dangerous situation into one involving reckless endangerment of the public and law enforcement alike. And all of this, less than six months after finishing supervision for another gun offense.

The firearm he so recklessly discarded was a Glock 17 9mm semi-automatic handgun that was ready to fire—with a round in the chamber—and 16 rounds in an extended magazine; those were 17 rounds that could have been ready to fire into the public space. (ECF No. 66 at 2; *see also* Figures 1-3, below).



*Figures 1 & 2. Photos of Defendant Gaskins' Glock 17 9mm, before and during processing.*



*Figure 3. Image from Google maps showing 2857 28th Street SE and 2853 28th Street SE with arrow marking the Defendants' direction of travel.*

Although no one was injured, the absence of tragedy here was a matter of luck, not restraint. The Guidelines here properly account for this heightened risk through the reckless-endangerment enhancement, and the facts of this case fall squarely within its intended scope.

### B.  The History and Characteristics of the Defendant

The defendant's criminal history tells a decade-long story of firearm possession as well as assaultive conduct. As noted in the PSR, in 2016, the defendant was convicted of carrying a loaded

9

firearm while on supervision for a domestic violence matter in D.C. Superior Court.  According to the PSR, while on pretrial supervision for that gun matter, the defendant cut off his GPS monitor. had just concluded supervision for another firearm offense involving an extended magazine at the time of the instant offense. *See* PSR at 11, ¶36. In addition, while on pretrial supervision for that firearm offense, the defendant punched another individual in the face, resulting in a simple assault conviction.  *See* PSR at 11, ¶37.  Then, in 2018, less than two years after his prior firearms conviction, the defendant was arrested, and later convicted of, Unauthorized Use of a Vehicle, Fleeing, and Unlawful Possession of a Firearm—for possessing a pistol in a vehicle with a punched-out ignition and fleeing police. *See* PSR at 14, ¶40.  In 2020, the defendant was yet again arrested with a loaded firearm on his person—on that occasion riding a dirt bike with a gun in his waistband. *See* PSR at 18, ¶41.  Time and time again, the defendant carried loaded firearms in dangerous situations.  His history shows assault and disregard for court orders.  His convictions demonstrates that prior court supervision, leniency and intervention failed to deter him from returning to precisely the same dangerous conduct.

In addition, the defendant's record reflects multiple arrests for assaultive conduct and other firearm possession over the last 15 years.   In addition, the defendant admitted possession of cocaine in addition to the firearm in this case. (*See* ECF 65 at 2). The confluence is particularly dangerous.

The defendant's conduct placed himself at the intersection of gun violence and the drug epidemic, two of the most acute public-safety crises facing this District. Put simply, when the defendant is in the community, he arms himself. His conduct reflects a repeated and knowing disregard for the law and for the safety of others.

### C. The Need for the Sentenced Imposed to Afford Adequate Deterrence

A custodial sentence is necessary to achieve both specific and general deterrence. The defendant has already demonstrated that prior firearm prosecution and supervision were insufficient to prevent him from reoffending. A meaningful term of incarceration is therefore necessary to interrupt this cycle and to protect the public from further dangerous conduct. General deterrence is equally important. Illegal firearm possession, particularly involving loaded weapons and flight from police, poses a profound risk to the community. A guidelines sentence communicates that such conduct will be met with firm and predictable consequences.

As noted previously, this is not the defendant's first firearm offense. Given the defendant's history, it is clear that he has not learned from his past conduct. At the time of the instant offense, the defendant has just finished supervision for another firearms offense involving an extended magazine. The defendant has had multiple opportunities on supervision after firearms offenses, and despite the opportunities afforded to him, he consistently arms himself. Therefore, a term of incarceration is also necessary to deter the defendant from unlawfully possessing firearms in the future.

### D. The Desire to Avoid Unwanted Sentence Disparities

Finally, one of the goals of the Guidelines is to avoid sentence disparities among similarly situated defendants. According to data collected by the United States Sentencing Commission, of the firearms cases from the last five fiscal years where the defendant was sentenced pursuant to U.S.S.G. § 2K2.1, was an Offense Level 22 and had a Criminal History Category of IV, the average incarceration length was 66 months' imprisonment and the median incarceration length was 63 months' imprisonment. *See* United States Sentencing Commission, Judiciary Sentencing Information, "JSIN" https://jsin.ussc.gov/analytics/saw.dll?Dashboard (last visited May 26, 2026).

11

As evidenced by the Sentencing Commission's data, the government's requested sentence of 70 months' imprisonment is measured, reasonable, driven by data, and squarely in line with sentences given to similarly situated defendants—particularly, whereas here, the firearm was possessed in proximity to drugs. It also is warranted by the seriousness of the offense, protects the public, and promotes respect for the law.

## CONCLUSION

For the foregoing reasons, the United States respectfully recommends that the court sentence Defendant James Gaskins to 70 months' imprisonment, to be followed by three years of supervised release.

Respectfully Submitted,

Jeanine Ferris Pirro
United States Attorney

By:    */s/ Caelainn Carney*
CAELAINN CARNEY
Assistant United States Attorney
N.Y. Bar No. 5751672
United States Attorney's Office
601 D Street, N.W.
Washington, D.C. 20530
Telephone: 202-714-6433
Email: caelainn.carney@usdoj.gov